[No. B010220. Second Dist., Div. Seven. Dec. 12, 1986.]

MERREL E. KALEY, Plaintiff and Respondent, v.
CATALINA YACHTS, Defendant and Appellant.

1188

**COUNSEL**

Feinberg, Gottlieb & Grossman, William A. Feinberg, Mark S. Gottlieb, Mommaerts & Rutledge and Arthur D. Rutledge for Defendant and Appellant.

Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg, Gary M. Paul and Michael L. Goldberg, for Plaintiff and Respondent.

**OPINION**

**BARRERA, J.\***—This is an appeal from a judgment rendered in favor of Merrel Kaley (Kaley) and against Catalina Yachts, a corporation (Catalina). Finding the appeal unmeritorious, we affirm the judgment.

### THE INCIDENT

It was drizzling on September 21, 1978, as Kaley and Leonard Klatt, riding in a Kenworth tractor (the truck), came to the crest of a steep, downhill grade outside of Ozona, Texas. On the right, there was a cliff, an apparent mile-and-a-half drop that made the trees below look minuscule. On the left, there was a sheer, rock wall. As they started their descent, the transmission

---

*Assigned by the Chairperson of the Judicial Council.

malfunctioned, locked in neutral and deprived the accelerating truck of the braking influence of the lower gears. Kaley fought the transmission, seeking to put the truck into any gear. It didn't work. He applied a little pressure on the air brakes. The empty trailer behind started to sway from side to side and then to slide toward the cliff. He tried once more to put the truck into gear, failed and turned hard, away from the cliff. The trailer turned over. The truck hit the rock wall, bounced and came to rest over the precipice, affording the battered and bloodied Kaley "an airplane view."[1] He could see no ground immediately beneath him.

The stress suffered as a result caused him a heart attack about 19 months later. Although he drove for three companies after the incident, he developed a strong fear of driving and his career as a truck driver came to an end.

The jury impliedly found that Catalina was the owner of the truck, it was negligent in not maintaining the truck in a safe operating condition and Catalina's negligence was the sole legal cause of Kaley's injuries.[2] It awarded Kaley $407,000. The trial court reduced the award by the amount of the workers' compensation benefits earlier paid to Kaley and rendered judgment. This appeal followed.

## I

### BANKRUPTCY ISSUES

While the litigation was pending, Kaley started bankruptcy proceedings but did not list the cause of action on any of the bankruptcy schedules. On January 18, 1983, he was discharged in bankruptcy. On October 1, 1984, one day before the taking of trial testimony began, the issue of the bankruptcy surfaced. Before the jury reached its verdict, Mr. Paul, Kaley's attorney, was hired to represent the trustee in the instant litigation. In a postjudgment proceeding, Mr. Block, the attorney representing the trustee generally, presented the court with a certified copy of a stipulation that the cause of action and/or the proceeds from the judgment were the exclusive property of the bankruptcy estate. It was executed by Kaley, the trustee and the bankruptcy judge.

A. *Kaley's Standing to Continue the Prosecution of the Action After the Initiation of the Bankruptcy Proceedings*

Catalina argues at length that it was denied a fair trial against the real party in interest, the trustee in bankruptcy, in whom the cause of action

---

[1]Kaley's words.

[2]There was only a general verdict rendered by the jury.

was vested from the time of the filing of the bankruptcy proceedings.[3] It contends that the trustee ought to have been substituted in from that time, and Catalina afforded the right to conduct settlement conferences with the trustee and to bring his identity to the attention of the jury. Catalina further argues that, whether or not the trustee substituted into the lawsuit, Kaley lost standing to continue the lawsuit from the time that the bankruptcy proceedings were initiated. Thus, Catalina concludes, the judgment was in favor of a nonparty and in excess of the jurisdiction of the court.

Catalina's arguments do not consider Code of Civil Procedure section 385, which provides in relevant part: "An action . . . does not abate . . . by the transfer of any interest therein, if the cause of action survive or continue. .ˑ. . In case of . . . transfer of interest, *the action . . . may be continued in the name of the original party,* or the court may allow the person to whom the transfer is made to be substituted in the action . . . ." (Italics added; Code Civ. Proc., § 385, subd. (a).) ██ Clearly a bankrupt's cause of action for personal injuries becomes a part of the bankruptcy estate upon the filing of the petition in bankruptcy. (11 U.S.C. § 541(a)(1); *Carmona* v. *Robinson* (9th Cir. 1964) 336 F.2d 518, 521; *Sierra Switchboard Co.* v. *Westinghouse Elec. Corp.* (9th Cir. 1986) 789 F.2d 705, 707-709.) However, the transfer, by operation of law, does not divest the plaintiff of his right to continue to prosecute the action, pending assertive action by the representative of the estate, the trustee in bankruptcy. (11 U.S.C. § 323(a).) The trustee may, among other things,[4] allow the plaintiff to pursue the action and await the results, any recovery being first for the benefit of the estate.[5] (*Johnson* v. *Collier* (1912) 222 U.S. 538, 540 [56 L.Ed. 306, 307-308, 32 S.Ct. 104]; *Meyer* v. *Fleming, supra,* 327 U.S. at pp. 165-166 [90 L.Ed. at pp. 598-599]; *Shivell* v. *Hurd* (1953) 115 Cal.App.2d 405, 406-407; *Stewart* v. *Spaulding* (1887) 72 Cal. 264, 266 [13 P. 661]; Rule 6009 of the Fed. Bankruptcy Rules; 11 U.S.C. § 323(b).)

██ Catalina argues that the California real party in interest statute, Code of Civil Procedure section 367,[6] mandates that the action be prosecuted by the trustee in bankruptcy as the real party in interest. The answer is that

---

[3]More accurately, the cause of action vested in the estate, of which the trustee is the representative. (11 U.S.C. §§ 541(a)(1) and 323(a).) See the discussion which follows.

[4]The trustee may, in addition to what was done in the instant case, abandon the property if it is burdensome to the estate or of inconsequential value. (11 U.S.C. § 554(a).) He may also abate the action and commence a new one or he may intervene in the pending action, substituting in as the real party in interest. (*Meyer* v. *Fleming* (1946) 327 U.S. 161 [90 L.Ed. 595, 66 S.Ct. 382].)

[5]Not only, then, does the plaintiff not lose standing to continue the prosecution of the action, in the absence of assertive action by the trustee, failure to do so diligently may have adverse consequences. (See *Suman* v. *Archibald* (1897) 116 Cal. 41, 42 [47 P. 865].)

[6]"Every action must be prosecuted in the name of the real party in interest, . . . ."

until a trustee in bankruptcy intervenes and substitutes himself in, he is not the real party in interest. (*American Foods* v. *Dezauche* (W.D.N.Y. 1947) 74 F.Supp. 681, 682-683.) Code of Civil Procedure section 385 expressly authorizes the plaintiff to remain the real party in interest even after the cause of action has been transferred to the estate by operation of law, until such time as the trustee seeks, and is allowed, to substitute in by the court.[7] Catalina hypothesizes that had it not discovered Kaley's bankruptcy, the trustee would have been entitled to prosecute the same cause of action against Catalina even after Kaley dissipated the fruits of the judgment. We need not address whether the hypothesis is legally sound.[8] Suffice it to say that the bankruptcy did come to light, albeit quite late in the litigation, the trustee was put on notice and he is now concluded by the judgment, i.e., estopped from prosecuting the action anew against Catalina. (*Kaplan* v. *Hacker* (1952) 113 Cal.App.2d 571, 573-574 [248 P.2d 464]; *Paradise* v. *Vogtlandische Maschinen-Fabrik* (3d Cir. 1938) 99 F.2d 53, 55.)

■ The reason for the real party in interest statute is to protect a defendant from a multiplicity of actions predicated on the same gravamen and to preserve to that defendant all personal defenses and counterclaims available. Catalina is protected from further suit by the trustee and there is no issue, here, about personal defenses or setoffs against the trustee which were unavailable against Kaley. The objective has been met. The protection of the statute has been afforded. Catalina can have no further legitimate concern. (*Giselman* v. *Starr* (1895) 106 Cal. 651, 657-658 [40 P. 8]; *Mosier* v. *Suburban Estates, Inc., Ltd.* (1934) 137 Cal.App. 574, 575-576 [31 P.2d 209]; *Kaplan* v. *Hacker, supra,* 113 Cal.App.2d at pp. 573-574.)

In support of its argument that Kaley lost standing to prosecute the action upon the filing of the bankruptcy proceedings, Catalina cites three California cases. *Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822 [69 Cal.Rptr. 321, 442 P.2d 377] and *Tarr* v. *Merco Constr. Engineers, Inc.* (1978) 84 Cal.App.3d 707 [148 Cal.Rptr. 813], are clearly cases where the actions were filed by the plaintiff after the bankruptcy proceedings had terminated or were, at least, pending. *Massey* v. *Bank of America* (1976) 56 Cal.App.3d

---

[7]In the case of a trustee in bankruptcy seeking to be substituted in, the trial court lacks discretion not to allow the substitution. (11 U.S.C. §§ 541(a)(1) and 323(a).)

[8]Our attention has not been called to, nor have we found, any case where the debtor of an entity discharged in bankruptcy has been compelled to pay twice. So long as such a debtor is not and cannot be charged with knowledge of the bankruptcy, we think it improbable that such a case is to, or ever will, be found in the annals of American jurisprudence. See, e.g., *Johnson* v. *Collier, supra,* 222 U.S. 538 where, at page 540 [56 L.Ed. at page 308], the high court states: "Nor is there any merit in the suggestion that this might involve a liability to pay both the bankrupt and the trustee. The defendant in any such suit can, by order of the bankruptcy court, be amply protected against any danger of being made to pay twice."

29 [128 Cal.Rptr. 144], is a case where the facts are not clear about when the complaint in the action was filed, i.e., before or after bankruptcy proceedings were begun. Because the plaintiff lacked standing to sue, the cause of action having vested in the trustee as was the law then (former Bankruptcy Act, § 70, subd. (a)(6); 11 U.S.C. § 110(a)(6)), demurrers were sustained and judgments of dismissal were entered in *Reichert* and *Tarr* and a motion for summary judgment was granted in *Massey*. The judgments rendered were affirmed on appeal. If all three cases concern themselves with actions predicated on events preceding the bankruptcy litigation and commenced by plaintiffs already discharged in bankruptcy or, at least, subject to the jurisdiction of the bankruptcy court at the time of the filing of the action, the cases are clearly distinguishable from the instant case.[9] See *Cleverdon v. Gray* (1944) 62 Cal.App.2d 612 [145 P.2d 95], where the plaintiff was allowed to continue with the litigation begun before the assignment of the cause of action. The defendants there made substantially the same arguments as Catalina makes, focusing on Code of Civil Procedure section 367. (*Cleverdon, supra,* at pp. 615-616.) There, as here, Code of Civil Procedure section 385 was found controlling. We hold, therefore, that where bankruptcy proceedings are commenced after the initiation of an action for personal injuries, the plaintiff may continue to prosecute the action until the trustee in bankruptcy takes assertive action, as earlier discussed, which is incompatible with the plaintiff remaining the real party in interest. (Code Civ. Proc., § 385, subd. (a).)

### B. *Catalina's Contentions That It Was Denied Due Process*

 Catalina contends that it was denied due process because it was not afforded an opportunity to negotiate a settlement with the trustee, nor was

---

[9]If, in *Massey,* there was a filing of the bankruptcy proceedings after the initiation of the suit, we respectfully decline to follow its holding.

Catalina also cites *In re Ashley* (Bkrptcy. E.D. Mich. N.D. 1984) 41 B.R. 67, where, at page 69, we find the following: "On November 22, 1983, when the bankruptcy petition was filed, the cause of action [in previously instituted state court litigation] . . . became property of the estate. [Citations.] Accordingly, the debtor ceased to be the real party in interest and was substituted in that role by the trustee. Notwithstanding his [the attorney's] lack of knowledge, for all this occurred by operation of law, Mr. Bloomquist's 'client' was the trustee, and not the debtor." While we are not bound to follow the pronouncements of the bankruptcy courts (*Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64]), we note that, in *Ashley,* the attorney settled the case after the filing of the bankruptcy petition, which, as here, did not list the state litigation on the schedules. The trustee learned of the settlement before disbursal and sought an order compelling the custodian of the funds to turn over the settlement proceeds to her. The language in the case is perhaps overly broad, but the case stands only for the proposition that the trustee was not bound by the settlement, which was made without her knowledge and which she did not subsequently ratify.

In the case at bench, the trustee is deemed to have ratified Kaley's actions to the time when the trustee learned of the litigation and to have authorized Kaley's continued prosecution of the action thereafter.

the trustee apprised of a settlement offer of $100,000, impliedly extant during jury deliberations, which the trustee would not have rejected, given Mr. Paul's recommendation.[10] The argument lacks focus. What we have is a diffused complaint that Catalina was not afforded perfect justice. Looming in the hazy background is the unaddressed, but all important, question—by whom? Assuming that Catalina is, in this context, reproaching the judicial system, what did it do that affected settlement negotiations? Our attention is not called to any mistake of fact or law or misapplication of the law to the facts which was germane to the issue. It is difficult indeed to ascribe error to what Catalina here asserts as a denial of due process.

Further, the premises are speculative and the factual underpinnings in serious question. We note two things. A transcript of proceedings held in chambers four days before the verdict reveals the following:

"MR. PAUL: [A]s I informed the court we are working with the trustee.

". . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: "[I]s there any interest in trying to settle the case?

"MR. RUTLEDGE [Attorney for Catalina]: None.

". . . . . . . . . . . . . . . . . . . . . . . .

"MR. PAUL: I am always open. But these guys don't want to discuss."

Mr. Rutledge knew then, if not before, that Mr. Paul was working with the trustee but, nonetheless, unequivocally expressed no interest in settlement. In addition, the record reflects that Mr. Paul denied making the recommendation and declared that he would not have recommended even a $200,000 settlement to Kaley or the trustee.[11] Catalina cites nothing in the record which indicates that Mr. Paul's late-arriving client, the trustee, was not apprised of the offer or would have accepted that offer or any offer that Catalina made or was prepared to make had he been apprised of it. ■ "The *burden is on the appellant* not alone to show error, but to show *injury* from the error." (Italics in the original; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 325, p. 335.)

---

[10] It cites its counsel's declaration, made under penalty of perjury and submitted in a posttrial motion, that, while the jury was deliberating, Mr. Paul informed counsel of Kaley's rejection of the offer against Mr. Paul's recommendation.

[11] This was in a counterdeclaration, also under penalty of perjury, submitted in the same posttrial motion.

■ Catalina also maintains that it was denied due process by the trial court's ruling proscribing it from introducing any evidence of the bankruptcy or the trustee. Catalina points to the comment of the trial court, ". . . I would have a very difficult time justifying, permitting the trustee to be in front of the jury. I think that is prejudicial, highly prejudicial," and argues that, if it would have been prejudicial to include such evidence from the perspective of Kaley, it must, perforce, have been prejudicial to exclude it from the perspective of Catalina. The argument misses the mark. As the trial judge explained, "You are talking about Mr. Kaley's claim. He is the person and [it is] his injury and liability, causation, etc., [which] the jury has to focus upon, not a trustee." The proffered evidence did not bear on the credibility of any witness nor did it have any tendency in reason to prove or disprove any disputed fact. It was irrelevant. (Evid. Code, § 210.) We need not consider, therefore, whether it was also prejudicial to either side. That a jury might be less sympathetic to a trustee than to an injured plaintiff, as was argued at the trial by Catalina, may be a fact of life but is not legally germane.

II

CATALINA'S NEGLIGENCE

A. *Catalina's Ownership of the Truck*

■ Catalina contends that, in spite of the implied finding of the jury to the contrary, it cannot be deemed to be the owner of the truck as a matter of law. It cites Vehicle Code section 460[12] and argues that it did not have "all the incidents of ownership," setting out several "incidents of ownership" which it did not have.

The law does not require that *all* incidents of ownership be proven. (*Dorsey v. Barba* (1952) 38 Cal.2d 350, 353 [240 P.2d 604], overruled on other grounds in *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828 [59 Cal.Rptr. 276, 427 P.2d 988].) Ownership is a question of fact to be determined by a jury under appropriate instructions of law.

No issue is raised as to legal propriety of the instructions. ■ All inferences are drawn in favor of the respondent and the judgment must be upheld if there is substantial evidence to sustain the implied finding of the jury. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158]; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) There is.

---

[12]"An 'owner' is a person having all the incidents of ownership, . . ."

First, both Frank Butler, President of Catalina, and David Day, President of Coast to Coast Distributors, Incorporated (Coast), Kaley's employer on the date of the incident, testified. Neither produced the truck's title documents. That, of itself, is substantial evidence. The jury might well have found that it was within the power of either or both to produce such documents and failure to do so might properly have been held against Catalina. (*Hamilton* v. *Madison Auto Sales Co.* (1949) 94 Cal.App.2d 619, 623 [211 P.2d 335]; *Tieman* v. *Red Top Cab Co.* (1931) 117 Cal.App. 40, 46 [3 P.2d 381].) However, there is more.

There was a blurring of corporate identities between the two companies. Coast was started by David Day, husband of Sharon Day, Secretary of Catalina and Vice President or Secretary/Treasurer of Coast. Frank Butler guaranteed about $80,000 in loans made to Coast by Independence Bank, the bank that provided the funds with which David Day purchased the truck.[13] Coast's office was, for a time, on the Catalina factory premises, before moving to premises, also owned by Frank Butler, adjacent to the Catalina factory. Coast's only customer was Catalina for whom Coast hauled 16–20 boats each month in 1978.[14] Leonard Klatt, who drove the Coast trucks in 1978, "knew that they belonged to Catalina Yachts." He "handled all the paper work regarding the trucks . . . that went in the cab of the truck . . . the pink slips, registrations, not only on the trucks but all the trailers." He went "to the DMV [Dept. of Motor Vehicles] with Dave [David Day] when . . . [they] registered the trucks."[15]

Most importantly, Coast did not have the Interstate Commerce Commission license required for interstate hauling of freight not owned by the carrier.[16] Consequently, all Coast trucks bore the name of "Catalina Yachts" on their sides.[17] To add to the impression that the trucks were Catalina trucks, the drivers were issued credit cards and letters of introduction in the name of Catalina. The interstate fuel permit and the prorate registration[18]

---

[13]Our attention was not directed to, nor did we find, anything in the record indicating whether that particular loan was guaranteed by Mr. Butler.

[14]Coast did haul for other companies on return hauls to avoid coming back empty.

[15]He did also testify that he "never signed to register the trucks."

[16]The record is clear about how Coast hauled boats for Catalina but is unclear about how Coast hauled for other companies on return trips, given this rather serious impediment.

[17]This factor, too, standing alone, is substantial evidence of ownership. (See *LeMire* v. *Queirolo* (1967) 250 Cal.App.2d 799, 804-805 [58 Cal.Rptr. 804]; *Nash* v. *Wright* (1947) 82 Cal.App.2d 467, 473 [186 P.2d 686]; and *Tieman* v. *Red Top Cab Co., supra*, 117 Cal.App. at p. 45.)

[18]Prorate registration is proportionate registration which is issued to persons, operating only a portion of their fleet in California, who pay state taxes for only that part of the fleet operating here. (Veh. Code, § 8150 et seq.)

were also issued in the name of Catalina.[19] The evidence of Catalina's ownership of the truck was, indeed, substantial.

*Jacobs* v. *Bozzani Motors, Ltd.* (1952) 109 Cal.App.2d 681 [241 P.2d 642], cited by Catalina, is inapposite. In the case at bench the indicia of ownership were far more substantial than the indicia noted in *Jacobs* which reversed a finding of ownership, concluding that, under the facts, the defendant was a mere bailee and not an owner to whom the negligence of the tortfeasor could be imputed.

■ Catalina also cites Civil Code section 654, which reads, in part: "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others." It argues that there was no evidence whatsoever which expressly or impliedly demonstrated that Catalina itself possessed or used the truck "to the exclusion of others," pointing out that it was Coast that exclusively possessed or used the truck. As the statute clearly states, ownership is a right which may be shared among multiple entities to the exclusion of other entities. That Coast exercised the more substantial dominion over the truck does not compel the conclusion that Catalina exercised no dominion over the truck. The jury had ample evidence on which to find Catalina to be the owner of the truck whatever the dominion exercised by Coast.

## B. *Imputation of Coast's Negligence to Catalina*

■ Catalina maintains that, as a matter of law, it is not responsible for Kaley's injuries, even if it was found to be the owner of the truck, because it had no opportunity to control, repair or maintain the vehicle. Whether, in fact, Catalina had no such opportunity is immaterial. The transmission, which was air-assisted, required an airtight system. In May of 1978, an air leak in the transmission was noted and the truck was sent out for repairs. The jury might well have concluded that the repairs, if made, were negligently made because, shortly thereafter and within a month of the date of the incident, the transmission locked in neutral several times as Kevin Klatt drove eastbound on the Ventura Freeway. He pulled off the freeway each time and was able to make the transmission function again. He reported the problem to David Day. On the trip from California to Houston, Texas, immediately before the date of the incident, the transmission locked in neutral four or five times. Upon arrival in Houston, Leonard Klatt,

---

[19]David Day did testify that all of that was done without the authority of Frank Butler but the jury was not bound to accept that, especially in light of the close relationship between Coast and Catalina. Further, Frank Butler admitted seeing David Day's trucks bearing Catalina's name, although he did not remember seeing Catalina's name on *the* truck before the date of the incident.

who was Kaley's codriver and supervisor, notified David Day about the problem and was told to drive the truck back to Los Angeles for repairs. The following day, about 30 or 35 miles outside of Ozona, Texas, the transmission again locked in neutral, but, this time, with lamentable consequences.

It is indisputable that the transmission was an essential component of the braking system. Every owner has a duty to maintain all brakes *and component parts* in good condition and in good working order. (Veh. Code, § 26453; *Harris* v. *Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373 [113 Cal.Rptr. 489, 521 P.2d 481].) The duty to maintain the brakes in good working order is not delegable. (*Maloney* v. *Rath* (1968) 69 Cal.2d 442, 446 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1]; *Clark* v. *Dziabas* (1968) 69 Cal.2d 449, 451 [71 Cal.Rptr. 901, 445 P.2d 517].) That Coast may have undertaken to do all of the maintenance work on the truck does not absolve Catalina. There was certainly substantial evidence that Coast was Catalina's agent for that purpose. Assuming, however, that Coast was not Catalina's agent[20] but was, rather, an independent contractor, Catalina chose to do business with Coast and to allow it to operate and maintain the truck which the jury impliedly found to belong to Catalina. Catalina is in no better position than Ramona Rath in *Maloney* v. *Rath, supra,* 69 Cal.2d 442 or Bodo Dziabas in *Clark* v. *Dziabas, supra,* 69 Cal.2d 449, who had their brakes overhauled, some three months and six months respectively, before the accidents in those cases. The decisions of the trial courts in favor of Ms. Rath and Mr. Dziabas were reversed by the California Supreme Court. Negligence of the independent contractor is not a defense where the duty is nondelegable.[21] We hold, therefore, that the negligence of Coast was properly imputed to Catalina. The rationale for such a seemingly harsh rule is explained in *Maloney* v. *Rath, supra,* 69 Cal.2d at page 448, where the high court states: "The statutory provisions regulating the maintenance and equipment of automobiles constitute express legislative recognition of the fact that improperly maintained motor vehicles threaten 'a grave risk of serious bodily harm or death.' The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person who owns and operates the vehicle. He is the party primarily to be benefited by its use; he selects the contractor and is free to insist upon one who is financially responsible and to demand indemnity from him; the cost of his liability insurance that distributes the risk is properly attributable to his activities; and the discharge

---

[20]Instructions on the issue of agency were requested by Kaley but were not given to the jury. We admit to some curiosity about why but the issue is not before us.

[21]See *Ramsey* v. *Marutamaya Ogatsu Fireworks Co.* (1977) 72 Cal.App.3d 516 [140 Cal.Rptr. 247], where the negligence of the independent contractor occurred in a foreign country, beyond any sphere of influence which the defendants, sponsors of a fireworks display, might have had.

of the duty to exercise reasonable care in the maintenance of his vehicle is of the utmost importance to the public. . . ."[22]

## III

### CAUSATION AND JURY SYMPATHY

■ Catalina argues that the $407,000 judgment reflects the sympathy of the jury but "does not argue that a heart attack is not worth that amount of money. Rather, Catalina takes serious issue with its causation." We take all of that to mean that the amount is not so shocking as to compel reversal (*Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507 [15 Cal.Rptr. 161, 364 P.2d 337]), but that sympathy induced the jury to find causation where the evidence does not support such a finding. As we earlier said, the verdict of a jury will not be upset where there is substantial evidence to support it. If the evidence is in conflict, all inferences will be drawn in favor of the respondent. (*In re Marriage of Mix, supra,* 14 Cal.3d at p. 614.) Drs. Dahlgren and Vyden both testified that the accident was the basic or main cause of the heart attack. Kaley's attitude toward driving changed inordinately. Before the incident, he loved it and thereafter experienced such severe stress from it, especially on hills and in inclement weather, that his psychiatrist, Dr. Gottleib, felt that he ought not to drive again. The evidence was substantial. It supports the verdict.

## IV

### DEFENSES

#### A. *Kaley's Contributory Negligence*

■ Catalina maintains that Kaley was guilty of virtually complete contributory or comparative negligence for failing to care for himself after the accident as he ought, continuing to drive after the accident and attempting to drive the truck back to California knowing of the defective transmission. The jury was instructed on the issue and it impliedly found against Catalina. It is Catalina's burden to demonstrate error. (*In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 575 [187 Cal.Rptr. 200].) There is substantial evidence from which the jury could have properly found that Kaley's smoking and failure to modify his eating habits after the accident, for example, were

---

[22]Catalina, of course, did not operate the truck. It did, however, select Coast to haul Catalina boats on a truck which the jury impliedly found to be a Catalina truck. It was operated for the very substantial, if not primary, benefit of Catalina. The same policy considerations justifying the imposition of the nondelegable duty which were present in *Maloney* v. *Rath, supra,* 69 Cal.2d 443, are present here.

reasonable coping mechanisms, his continuing to drive in spite of the stress it produced was reasonable and his attempting to drive the truck with the defective transmission back to California with Leonard Klatt, as Klatt was ordered to do by David Day, was reasonable, all in light of all of the circumstances then extant. ■ On the same evidence, the jury also could have found none of the foregoing factors to be the proximate or legal cause of Kaley's injuries.[23] Finally, the jury could have found that any negligence by Kaley contributed only a negligible amount to his injuries. The state of the record is such that we cannot determine what the finding of the jury was on the issue.

■ ■ ■■ Catalina also maintains that Kaley was guilty of complete contributory or comparative negligence per se for operating a vehicle in an unsafe condition. (Veh. Code, § 24002.) The issue was not submitted to the jury. It may not be raised for the first time on appeal. (*In re Joseph E.* (1981) 124 Cal.App.3d 653, 657 [177 Cal.Rptr. 546].)[24]

### B. *Employer Benefits of the Workers' Compensation Law*

■ Lastly, Catalina contends that Kaley's exclusive remedy is workers' compensation benefits, citing *Marquez v. Bursch Trucking Co.* (1986) 186 Cal.App.3d 1255 [231 Cal.Rptr. 339]. While the affirmative defense was pleaded, Catalina does not indicate that any evidence was presented, or that the jury was instructed or requested to make a finding, on the issue of whether Catalina was Kaley's employer. *Marquez,* itself, is inapposite. In that case, the tractor owner (Hinderks) was responsible for maintaining the vehicle which he leased to Roadrunner and in which Marquez was injured when the steering malfunctioned. Hinderks selected Marquez to drive the vehicle with Roadrunner's approval but Roadrunner directed Marquez' activities and paid his salary and the workers' compensation insurance premiums, albeit the costs of those premiums were deducted from the lease payments due to Hinderks. The judgment against Roadrunner and in Marquez' favor was reversed. The *Marquez* court noted that ". . . the employees

---

[23]In fairness, we would find it difficult to uphold a finding that Kaley was negligent in driving the truck but that the driving was not the proximate or legal cause of his injuries. Of course, the problem of apportionment, under comparative negligence principles, would remain.

[24]We note that while BAJI No. 5.00, relating to the duty of a driver of a vehicle on a public highway, was requested by Catalina and given to the jury, there was no request for BAJI No. 3.45, relating to negligence per se for the violation of a statute, ordinance or safety order, nor was there a request that the jury be instructed on the duty imposed by the statute. Not every violation of a statute is negligence per se. An individual may violate a statute and still not be guilty of negligence per se if he can demonstrate that he acted as might be reasonably expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. (Evid. Code, § 669, subd. (b)(1).)

of the vehicle-lessor are deemed statutory employees of the lessee-carrier . . . just as if the lessee-carrier were the owner of the [vehicle] . . .," (*id.* at p. 1260) citing *White* v. *Excalibur Ins. Co.* (1979) 599 F.2d 50, 52-53. It ruled that, under the facts as well, Marquez was Roadrunner's employee and held that the nondelegable duty to properly maintain the tractor under federal law was to the general public of which Marquez, being an employee, was not a member and his exclusive remedy was, therefore, ". . . within the jurisdiction of the Workers' Compensation Law." (*Marquez* v. *Bursch Trucking Co., supra,* 186 Cal.App.3d at p. 1261.) There is certainly no showing here that Catalina ever directed Kaley's activities, paid his salary or wages or had him insured under the workers' compensation law. Catalina argues that, if it was found to be the owner of the truck, it must be found to be Kaley's de facto employer and thereby entitled to the employer benefits of that same law. No authority is cited for that conclusion and we find it a legal non sequitur.

Judgment affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied January 7, 1987, and appellant's petition for review by the Supreme Court was denied March 25, 1987.